**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

Norfolk Division

SHARLENE A. CHAPMAN,

Plaintiff,

v.

AVERETT UNIVERSITY,

Defendant.

Civil Action No.: 4:24-cv-00129

**AMENDED COMPLAINT**

(Jury Trial Demanded)

## I. INTRODUCTION

Plaintiff Sharlene A. Chapman respectfully submits this Amended Complaint pursuant to the Court's Order dated May 1, 2025. This complaint supersedes and replaces all prior pleadings in this case.

This action is brought under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990 (ADA). Plaintiff seeks relief for race discrimination, disability discrimination, retaliation, failure to provide reasonable accommodations, and the creation of a hostile work environment by Averett University, her current employer. As a result of these statutory violations, Plaintiff also seeks compensatory damages for the emotional harm she has suffered.

These claims are based on a pattern of unlawful conduct, including:

- Unequal course assignments based on race and disability,

- Denial of reasonable accommodations after medical disclosures,

- Hostile and retaliatory treatment following Plaintiff's EEOC complaints,

- Emotional distress caused by discriminatory and dismissive conduct from university leadership, and

- Defendant's failure to investigate or remediate a toxic work environment affecting Plaintiff and other minority faculty.

Plaintiff seeks compensatory damages, punitive damages, equitable relief, and all remedies permitted under federal law.

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction), as the claims arise under the Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990.

Venue is proper in this District under 28 U.S.C. § 1391(b) because the events or omissions giving rise to the claims occurred in this District, at Averett University's campus in Norfolk, Virginia.

## III. PARTIES

1. Plaintiff Sharlene A. Chapman is an African-American U.S. citizen residing in Hampton, Virginia. She has worked for Averett University since January 2023, initially through the staffing agency Amergis (Formerly known as Maxim) teaching labs, simulations, and hands-on clinical nursing courses that required bedside supervision of students in hospital settings [Ex W22 Doc 30][ W34 & W35 Doc. 61]. On March 27 2024, Averett hired her directly [Ex W41] to teach online didactic nursing courses, and she continued her on-site clinical, lab, and simulation instruction at the university's Norfolk campus until July 2024. In August 2024 she was diagnosed with moderate left-ventricular hypertrophy and tricuspid regurgitation [Exhibit Z5 Doc 1.] and as she continued to experience shortness of breath she was later diagnosed with asthma [Exhibit W25]; during the relevant period these cardiac and respiratory conditions substantially limited her ability to perform physically demanding tasks. She therefore has both a record of a disability and was regarded as disabled by Averett, bringing her within the ADA's protections. Ms. Chapman remains employed as an adjunct online instructor and, though still eligible to teach clinicals, has refrained from doing so because of her condition and per doctor recommendation. She proceeds pro se in this action.

2. Defendant Averett University is a private, nonprofit educational institution headquartered in Danville, Virginia, with additional campuses and instructional operations in Norfolk, Virginia. Averett employs well over 500 individuals and is, at all relevant times, an "employer" engaged in interstate commerce within the meaning of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990. The discriminatory and retaliatory acts alleged in this Complaint occurred while Plaintiff worked from Averett's Norfolk campus and remotely from her home in Hampton, Virginia, making venue proper in this District.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiff fully satisfied every administrative prerequisite before bringing this suit. Within 300 days of the first adverse acts on June 11, 2024, she filed Charge No. 437-2024-01942 with the

Equal Employment Opportunity Commission (EEOC) on August 5, 2024, alleging race discrimination, disability discrimination, retaliation, failure to provide reasonable accommodations, and a hostile work environment. The EEOC issued a Notice of Right to Sue dated August 9, 2024. She commenced this action on November 4, 2024, well within the 90-day filing window.

Because this charge asserts violations of both Title VII and the ADA, Plaintiff may seek in this Court:

(i) injunctive relief;

(ii) back pay;

(iii) compensatory damages—including emotional-distress awards and out-of-pocket therapy expenses—subject to the statutory cap for employers with more than 500 employees;

(iv) punitive damages if Averett's conduct is proven willful or reckless; and

(v) reasonable attorney's fees, litigation costs, and expert-witness fees pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 12205.

Averett's misconduct intensified after the first charge, leading Plaintiff to file Charge No. 437-2025-01175 on March 31, 2025—again within 300 days—alleging continuing ADA discrimination, retaliation for protected activity, and a racially and disability-based hostile work environment [Ex W2 & W3. Doc 30]. The EEOC issued a second Notice of Right to Sue dated April 1, 2025. This Amended Complaint is filed well within 90 days of that notice and preserves the same range of equitable and monetary remedies for post-August 2024 conduct, including injunctive measures to halt ongoing hostility (such as removal of hostile supervisors and mandatory EEO/ADA training), additional back pay, compensatory damages for continuing emotional harm, punitive damages where warranted, deposition fees, and further court-associated fees and expert-witness costs.

Accordingly, the two EEOC charges together exhaust all administrative obligations for every claim now asserted—race discrimination, disability discrimination, failure to accommodate, retaliation, and hostile work environment—while preserving Plaintiff's right to obtain the full spectrum of legal and equitable relief authorized by Title VII and the ADA.

## V. STATEMENT OF FACTS

### A. Employment Background

1.  Qualifications and Licensure
    Plaintiff Sharlene A. Chapman is a registered nurse licensed in the Commonwealth of Virginia. She holds a Master's degree in Nursing Education and certifications specifically in online instruction, credentials that Averett University's Division of Nursing validated during her 2024 onboarding[Ex. W21 Doc. 30]. Ms. Chapman also possess a Higher Ed Teaching

Online Certificate from Quality Matters (QM): The QM Teaching Online Certificate enables instructors to demonstrate their knowledge mastery of online teaching. Instructors who take the series are provided with the background knowledge needed for teaching online. Quality Matters is widely considered a national (and now international) standard-bearer for online-course quality. Ms. Chapman has also taught online and in person health assessment courses at another university (NUR211 equivalent) [Ex. W17 Doc 30.].

2. Initial Appointment through Amergis (formerly Maxim)
   In January 2023, Averett University engaged Ms. Chapman, via the staffing agency Maxim (now Amergis), to teach hands-on clinicals, simulations, and laboratory sessions for its Accelerated BSN (ABSN) program at the Norfolk instructional site [Ex.W22 Doc 30.]. Clinical duties were conducted at Bon Secours and Sentara-affiliated hospitals and labs and simulations were conducted at Averett's Norfolk campus, under the supervision of Associate Dean Dr. Kathy Cline.

3. Direct Hire as Online Adjunct
   On March 27 2024, Averett University hired Ms. Chapman directly as an adjunct online nursing instructor [Ex W41]. Under Averett's Adjunct Faculty Policy, she was eligible to teach up to 9 credit hours (approximately three courses) during the Fall and Spring semesters, and up to 6 credits (approximately two courses) during the Summer semester, with additional assignments available upon approval [Ex. A Doc.1].

4. Performance and Added Responsibilities
   Throughout 2023 and 2024, Ms. Chapman earned strong student evaluations [Ex. X1. Doc.1; W23 Doc 30], submitted all course deliverables on time, and was entrusted with onboarding new clinical instructors [Ex. W35 Doc 61]. These responsibilities reflect Averett's confidence in her professionalism, reliability, and instructional competence.

5. Current Status
   Ms. Chapman remains an adjunct faculty member, teaching ABSN didactic courses online from her home in Hampton, Virginia. Due to a documented medical condition, she has not taught clinical, lab, or other on-campus courses since July 2024, though she remains eligible and qualified to resume such assignments.

**B. Disability Disclosure, Request for Accommodation, and Escalation to HR**

6. On June 11, 2024, following an emergency room visit, Ms. Chapman informed her supervisor, Associate Dean Dr. Kathy Cline, via text of her symptoms: shortness of breath, chest pain, and palpitations [Ex. B4 Doc 1]. An echocardiogram in August 2024 confirmed moderate left ventricular hypertrophy with tricuspid regurgitation, and she was also later diagnosed with asthma—conditions that rendered 8- to 12-hour clinical shifts medically unsafe/unendurable. Relying on these findings, Ms. Chapman requested to be assigned the open online sections in lieu of on-site clinical assignments. She was already

teaching NUR 213 online and met all credentialing requirements for the additional courses [Ex. W16. Doc 30.].

7.  Dr. Cline responded via text that same day:

"Sorry about your illness. If you are having difficulty I don't believe you should take on more" [Exhibit B4 Doc.1] Later, after Ms. Chapman filed an EEOC charge and informed Dr Cline via email that she would miss a meeting due to medical reasons [Ex. I1 Doc 1], Dr. Cline responded: "What does this mean for your online classes?" [I2 Doc 1]

These antagonistic remarks were made despite Dr. Cline's knowledge that:
(1) Ms. Chapman depended on those courses for income, and
(2) the requested online courses were asynchronous and up to date, requiring no real-time meetings that might interfere with her medical care.

Although Ms. Chapman was eventually assigned one additional online course (NUR329), the University withheld the remaining courses and reassigned them to non-disabled instructors, including:

*   **Kaleigh Wilson, MSN, RN** – Who taught clinicals, labs, and simulations through the 3rd party contractor ORBIS was hired directly with Averett on August 19, 2024 as an adjunct online course instructor to teach NUR211, more than two months after Ms. Chapman requested NUR 211 [Ex. W41], had no online teaching experience, no didactic nursing teaching experience, and no online teaching certifications, yet was assigned the online course NUR 211. Dr Cline stated her reason was: "Kaleigh needed a course to get her started with didactic"[Ex. C2 Doc 1]. Kaleigh Wilson also stated "she had been waiting to see if she would have more full time in the lab or not" because she "didn't want to over commit" herself [Ex. B7 Doc 1]
*   **Kimberly Lott, EdD** – received online assignments, including NUR330 that the Plaintiff requested causing her to exceed the university's 150% workload cap or 16 credits per term cap, in violation of stated policy. [Ex. W15. Doc 30] and [Ex. W36. Doc 61]

    *(Note: An EdD or Doctor of Education emphasizes the practical application of research and theory to solve problems of practice. EdD Graduates often move into roles such as dean, superintendent, training director, or chief learning officer on the other hand a Ph.D. prepares individuals for research and academic careers like faculty, education researchers, or policy analysts). The minimum requirement for an adjunct online course instructor at Averett is an MSN.*

8.  On August 15, 2024, Ms. Chapman escalated her complaint by emailing HR Director Kathy Tune, Dean Dr. Teresa Beach, President Dr. Tiffany Franks, and Vice President of Academics Virginia Henderson [Ex. J1. Doc 1]. She described the anxiety she was experiencing from working with Dr. Cline and how it exacerbated her shortness of breath, she explained that she missed the meeting due to anxiety, she requested an update on her prior complaint, and referenced that another employee, Veronica Zeigler (Latina), had also reported retaliation by Dr. Cline after medical leave. Ms. Chapman attached a

physician's work note to this email directing her to avoid stressful interactions and physically strenuous activities [Exhibit Z4. Doc 1].

HR responded only with a vague statement:

"Dr. Beach is taking all steps and following all protocols."

They refused to provide written answers and insisted on a phone call. No meeting was scheduled, no alternative accommodations were proposed, and Dr. Cline continued to supervise Ms. Chapman without modification or mediation.

9. Because Ms. Chapman was fully qualified to teach the additional online sections and had already been teaching NUR213 successfully, her accommodation request was reasonable and medically documented. Averett's partial one-course offer, made without a good faith dialogue, and despite medical evidence and a physician's recommendation, failed to satisfy the ADA.

   Additionally, in November 2024, Averett released a revised Employee Handbook that, for the first time, explicitly expanded its ADA and workplace accommodations policy to cover job applicants and interviewees—not just current employees. The prior June 2024 version limited its language to accommodations for existing employees, with no mention of the hiring process. The November update also removed detailed in-handbook procedures and instead directed readers to separate policy documents such as the September 2024 "Workplace Accommodation Policy" and the "Procedures for Requesting Workplace Accommodations Policy". This shift, along with the timing of the changes amid pending litigation, and EEOC charges reflects that Averett's compliance efforts were reactive, not part of a long-standing, proactive commitment to equal access and nondiscrimination. [Exhibit W42]

## C. Disparate Treatment Based on Race and Disability

10. After disclosing her medical condition and requesting an accommodation, Ms. Chapman was denied the NUR211 or NUR330 online course assignments despite her excellent performance, full qualifications, and availability. Those same courses were awarded to white, non-disabled colleagues—some of whom lacked credentials or were placed into credit overload.

11. Instructors who received the courses Ms. Chapman sought include: **Kaleigh Wilson, MSN, RN (NUR211) and Kimberly Lott, EdD (NUR330)** [Ex. H2 Doc.1].

    Additionally, **Sarah Salen, DNP, MSN, RN** also an adjunct course instructor– taught three online courses (9 credits) in Summer 2024 [Ex. W37 Doc 61 and H1 Doc 1]., exceeding the 6-credit limit for adjuncts during the summer term as stated in Averett's Faculty Handbook [Ex. A & H2. Doc 1]. Although these courses were not ones Ms. Chapman specifically requested, this preferential treatment illustrates inconsistent enforcement of credit limits and favoritism toward white adjuncts. By contrast, Ms.

Chapman was only assigned 6 credits in the Fall 2024 and was denied the 9-credit Fall 2024 load she requested, despite being fully qualified and available.

Dr Cline even allowed them [white educators] to choose between the ones Plaintiff had previously requested telling the Plaintiff "I had promised Dr. Lott a course and I think she wanted 330, but if she wants 329 I will give that to her and you can take 330. Wait for her to make up her mind" [Ex. C2. Doc 1] Dr Cline is also seen in an email telling another employee that she may give NUR329 and NUR330 to the plaintiff if she "cant find someone else" with no just cause even after the other employee [Chawndel Edmonds] told her she [the plaintiff] was doing a great job [Ex W19. Doc 30].

12. Ms. Chapman met or exceeded all qualifications for the assignments she sought—holding the requisite degrees, certifications, and consistently strong student evaluations—while the comparators were granted courses without transparent criteria and, in several cases, despite lacking credentials or exceeding load limits.

13. This inconsistent, opaque assignment process, combined with Averett's refusal to accommodate Ms. Chapman's disability, demonstrates both disability discrimination and racial bias: every instructor prioritized over her was white.

14. Ms. Chapman's request to teach up to 11 credits after disclosing her disability (NUR211 (2cr), NUR213 (3cr), NUR329 (3cr), & NUR330(3cr) [Ex W16 & W24. Doc.30]. —or at minimum the standard 9-credit adjunct load—was within Averett's adjunct faculty policy and below the 12-credit full-time classification threshold [Ex. W36. Doc 61] Her request remained within the scope of adjunct teaching duties, and at no time during or after her request for reasonable accommodations did she request a change in title, promotion, or reclassification. Ms. Chapman even stated via text message that she would be happy to take the courses even as an adjunct.

15. In contrast, white faculty members were allowed to exceed institutional credit-hour limits without scrutiny or consequence. For example, Sarah Salen taught 9 credits in Summer 2024, violating the Faculty Handbook's 6-credit summer cap, and Kimberly Lott, already full-time, exceeded the 150% faculty workload limit but was given priority over Ms. Chapman for desired sections.

16. Each credit hour paid approximately $1,500, so Plaintiff's requested 9-credit workload would have yielded $13,500 per term, or up to $40,500 annually—well below the average full-time faculty salary of approximately $70,000. Even if Ms. Chapman had been granted all 11 requested credits, her maximum projected income would have totaled $49,500, still below a full time pay scale.

17. The denial of available course sections to Ms. Chapman—despite her eligibility and request—while permitting white colleagues to exceed established policy limits, reflects unequal treatment and suggests a lack of consistent application of Averett's adjunct faculty policies.

**D. Retaliation and Performance Evaluation Timeline**

18. On July 3, 2024, Ms. Chapman received her first annual performance evaluation from Dr Cline. While most categories received ("4s out of 5"), she received a "3" in one category

tied to course reports—documents she had never been informed of and neither she nor Dr Cline could locate them in a central online location [Ex. D1 & F6. Doc 1]. Despite multiple requests for clarification, Dr. Cline refused to modify the evaluation, stating: "We are not changing any evaluations." [Ex F6. Doc.1].
White colleagues with similar or worse recordkeeping gaps, grading issues, or student attendance documentation deficiencies received uniformly higher ratings of all 4s.

19. In the same evaluation cycle, Dr. Nganso, another Black faculty member, received a "3" in a category unrelated to her job duties—job duties that were actually Dr. Cline's [Ex. H4. Doc. 1] &[W18. Doc. 30]. Similarly, Dr. Alvin Pierce received a "3" for missing faculty meetings despite perfect attendance in on site meetings and denied the stated basis [Ex. H3. Doc 1]. These inconsistencies suggest arbitrary or targeted scoring patterns against faculty of color.

20. July 9 2024 Ms. Chapman recorded a Zoom meeting [Ex W26. Doc 38].  with Dr. Cline during which Dr. Cline stated:

- "You're probably one of those students I'd just say deal with it," and
- "I would have given you more but it had to be *equal*."
- "And you want my job?"
- "No one is going to see the evaluation but me"
- "I think you are wonderful and excellent because a 4 is the top number and you got the highest scores"
- "You wouldn't have survived under me in the hospital" and
- "I'm satisfied." When the Ms. Chapman questioned what the score is to be considered a satisfactory evaluation

These statements were made without justification, while Cline also misrepresented Ms. Chapman's evaluation scores, claiming she received the highest.

21. Following her EEOC complaint filed on August 9, 2024, Ms. Chapman experienced escalating retaliation, including:

- Exclusion from student test review sessions or unexpected rescheduling (Test review sessions were rescheduled at the direction of Office Manager Sandra Raker-White) [Exhibits W8, W9, W10, W11, W12, W14. Doc.30].
- Test reviews held without her, despite confirmations of her availability;
- Hostile and antagonistic emails from Dr. Cline in response to standard questions regarding professional development and medical appointments. [Ex. W7, Doc. 30] &[I1 & I2. Doc.1].
- Dismissive and contradictory emails from Dr Beach when Plaintiff brought up concerns regarding Dr Cline and the student test make up policy [Exhibits Y1-Y6 Doc.1] &[W12. Doc. 30],
- Continued course denial for Spring 2025 and Summer 2025

22. On March 28, 2025, despite a clear written directive from Ms. Chapman not to conduct a student test review without her, the session was held anyway. These reviews are a key faculty responsibility and directly affect student outcomes and faculty evaluations. Her exclusion jeopardized both.

23. No comparable disruptions occurred prior to Plaintiff's protected activity. Before that, Ms. Chapman had no history of issues with test reviews or scheduling. Other faculty of color, including Veronica Zeigler, experienced similar exclusion and hostility after returning from FMLA leave—including comments by Dr. Cline stating that she would resign if Zeigler returned and being reported by Dr Cline to her ORBIS manager Debra Byrant for wearing a "*durag*" when it was in fact a wide headband.

24. The sequence and nature of adverse acts—including performance evaluation disparities, duty exclusions, and hostile supervisory conduct—occurred shortly after protected activities (Request for reasonable accommodations June 11 2024, Internal Discrimination Complaint July 31 2024, EEOC charge in August 2024) and constitute retaliation under federal law.

Taken together, the July 3, 2024 downgraded evaluation and denial of courses after Ms. Chapman's June 11 accommodation request, Dr. Cline's disparaging remarks in the July 9 recorded meeting, and the escalating exclusions, dismissive comments, and antagonistic conduct following Ms. Chapman's July 31 internal complaint and August 9 EEOC charge—continuing through March 28, 2025—form a temporally linked pattern of retaliation. This sustained campaign of adverse actions has dissuaded Ms. Chapman from using Averett's internal reporting channels and left her feeling unsafe raising any further concerns.

## E. Retaliation Continued and Institutional Failures

25. On August 15, 2024, Ms. Chapman escalated her concerns again in writing to Averett leadership—HR Director Kathy Tune, Dean Teresa Beach, President Tiffany Franks, and VP of Academics Virginia Henderson—describing her workplace anxiety, discriminatory treatment by Dr. Cline, and the University's longstanding failure to address prior complaints[Ex. J1. Doc 1]. In that email she also referenced Veronica Zeigler, a Latina faculty member who had herself experienced retaliation by Dr. Cline after recently returning from FMLA leave.

26. Despite attaching a physician's note to this email instructing her to avoid stressful environments and detailing her worsening mental health in that email, Ms. Chapman received no assurance that her concerns would be investigated, no protective measures were offered, and Dr. Cline remained Ms. Chapman's direct supervisor. No alternative accommodation or mediation process was initiated.

27. Averett's only response was a vague email from HR [Ex. J2 Doc. 1]:

"Dr. Beach is taking all steps and following all protocols" And "As far as personnel updates, Beach nor I can discuss personnel matters"

No details were provided, no written explanation was offered, no meeting was convened, no investigation results were shared, and subsequent follow-up was redirected to a phone call request after Ms. Chapman requested email communication for clear expectations and documentation purposes.

28. Ms. Chapman's authority as an instructor was repeatedly undermined by leadership. In one instance when approving a makeup exam for a student, Ms. Chapman questioned the university policy in approval for a non-excused reason. However, Dr. Cline and Office Manager Sandra Raker directed Ms. Chapman to "go ahead and approve it in the SmartSheet,". Something the Plaintiff had never done before, nor was she trained to do.

When Ms. Chapman sought clarification and guidance from Dr Teresa Beach asking what she would suggest to avoid getting in trouble for approving an unapproved reason. Dr. Beach, responded on September 4, 2024:

"Dr. Cline has the ability to approve this type of request if in her assessment, it is acceptable." And suggested that the Plaintiff review the test review policy

Yet just six weeks later, when the test make up policy was brought up again by another faculty member, Dr. Beach took the opposite position, questioning why a makeup exam would be administered if the professor had not approved it:

"If the professor does not approve for the student to make up the exam, why would it still be administered?"
(Email dated October 17, 2024)

The shift in tone and treatment following Ms. Chapman's EEOC filing reflects retaliatory dismissal of her concerns and illustrates the broader climate of control, inconsistency, and marginalization within Averett University.

**F. Hostile Work Environment**

29. Veronica Zeigler, the Latina colleague referenced in Ms. Chapman's August 15 email, suffered similar retaliation: Sandra Raker (the same office manager who made changes to Ms. Chapmans exam reviews without her notice and held them without Ms. Chapmans attendance) told Veronica she "resented her" when she returned from FMLA and verbally attacked and reported Veronica when she attempted to clean the break room causing an argument over the tidying of coffee creamers that were for everyone. Upon return from FMLA Dr. Cline also shut Zeigler out—closing her office door, leaving rooms when Zeigler arrived to assist with work activities, and even relocating her own office to avoid her. Dr. Cline allegedly declared to Veronicas manager at ORBIS [Debra Bryant] that she would "leave Averett" if Zeigler returned suggesting to fire her while she was out on FMLA.

30. Calise Greenaway, an African American former Clinical Coordinator through Averett's third-party contractor ORBIS, also experienced racially hostile conduct from Dr. Kathy Cline. Ms. Greenaway reported that Dr. Cline asked, "Why do these African students keep coming here to get an education?" and made disparaging remarks about one African student needing to "learn English." After Ms. Greenaway objected to Dr. Cline's tone and asked not to be addressed disrespectfully in emails, Dr. Cline ceased communication with her entirely—excluding her from critical emails, meetings, and operational decisions necessary to fulfill her role. Ms. Greenaway further witnessed Dr. Cline attempting to have another Black employee, Patrice Sainville-Thompson, removed from her position without cause by using Calise and Veronica to reprimand her. These incidents support a pattern of discriminatory and exclusionary behavior by Dr. Cline toward faculty reinforcing the broader hostile environment described by Plaintiff and others. Calise Greenaway eventually resigned to rid herself of the hostile climate at Averett University.

31. Dr. Chawndel Edmonds, an African American faculty member and mother of a disabled child, was hired for the Online Didactic ABSN Course Lead position, but was nonetheless forced to work on site—unlike her white colleague, Dr. Amanda Carter, who was hired in the same role from Florida and permitted to remain fully remote. When Dr. Edmonds raised concerns about the disparity in treatment between herself and her similarly situated white peer, Dean Teresa Beach responded that Dr. Cline stated, "I didn't know that assignments had to be equal."[Exhibit W27. Doc. 44]. That same rationale was later repeated by Dr. Cline in response to Ms. Chapman's objection to her own performance evaluation, during which Dr. Cline claimed she "would have given [Plaintiff] more, but it had to be....equal." [see exhibit W26] A few months after Dr. Edmonds filed her internal complaint, Dr. Cline assigned equal evaluation scores to both Dr. Edmonds and Dr. Carter, despite marked differences in working conditions and responsibilities. Following her complaint, Dr. Edmonds was assigned trivial tasks, volunteered for on-site duties that her white counterpart was not asked to complete, and continued to be subject to unequal treatment, including being scheduled for in-person responsibilities. Whenever she raised concerns she was met with hostility by Dr Cline. Notably, Ms. Chapman had also applied for the ABSN Didactic Course Lead position in January 2024, but after interviewing via zoom, was told by both Dr. Beach and Dr. Cline that she was ineligible because the role required on-site availability Monday through Friday. The subsequent remote appointment of Dr. Carter, a white faculty member who resides in Florida, directly contradicts that justification and reflects pretextual reasoning and racially disparate access to leadership opportunities.

32. Nursing student Nathalie Willis, who is African-American, reported that Sandra Raker would not allow her to take her exam due to being out of dress code. When Ms. Willis went to Dr. Cline to explain the situation, Ms. Raker followed her into Dr. Cline's office, verbally attacked her, and pointed her finger in her face. When Ms. Willis asked Dr. Cline whether she had witnessed the incident, Dr. Cline denied seeing any misconduct when it had occurred directly in front of her and, when Ms. Willis insisted on the truth, she [Cline] threatened to discipline her for calling Dr. Cline a liar.

33. Mathieu Tolno, an African nursing student who was dismissed from the program, is prepared to testify to similar discriminatory treatment by Averett staff, further demonstrating a pattern of hostility toward Black faculty and students. Tolno describes a situation in the Fall of 2023 where he experienced extenuating circumstances where he originally got approval to turn in late assignments that was later denied by Dr Cline. When it became time to turn the assignments in Dr Cline encouraged his instructors to give him 0s despite his prior approval and circumstances. Tolno explains how Dr Cline tried to force him to sign a university dismissal/exit form before he submitted a grade appeal per the student handbook and how he was locked out of Canvas making it impossible to turn in his late assignments. He describes a situation where Dr Cline banged a table and spoke to him condescendingly when he would not sign a document stating he had failed the courses. Tolno states he was discouraged from reapplying when Dr Beach told him it was not a guarantee he would be readmitted. Other white students submitted grade appeals and were allowed to turn in assignments after their courses closed to receive credit and pass classes that they would have otherwise failed without the late work.

The pervasive and well-documented hostility experienced by other minority faculty and students—whom, like Ms. Chapman, were of color or individuals seeking accommodations—exacerbated her own psychological vulnerability and deepened her sense of isolation in the workplace. Observing colleagues such as Veronica Zeigler, Calise Greenaway, Patrice Sainvil-Thompson, and Dr. Chawndel Edmonds endure being targeted, retaliated against, and excluded, for raising legitimate concerns reinforced Ms. Chapman's fear that asserting her rights would provoke further mistreatment. These events created a chilling effect, cultivating a culture where reporting discrimination invited punishment rather than protection and dissuaded many from telling their story. The institution's repeated failures—such as dismissing formal complaints, denying accommodations, and privileging white employees—compounded her anxiety and eroded her professional trust in Averett's leadership. As corroborated by Dr. Tsipursky's expert evaluation [Ex. W33 Expert Witness Report , Doc.61], these cumulative experiences led to clinically diagnosed PTSD and Generalized Anxiety Disorder, which substantially impaired her health and professional functioning [Ex. B5 Doc. 1; Ex. J1. Doc 1; Ex. W31. Doc 56; Ex W20 Doc. 30.; Ex Z8 Doc. 1]. This confluence of systemic hostility and personal psychological distress supports the conclusion that Ms. Chapman's experience of a hostile work environment was both subjectively real and objectively damaging.

**G. Emotional Harm and Medical Impact**

34. As a direct result of Averett University's discriminatory and retaliatory conduct, Ms. Chapman has suffered significant and ongoing psychological harm. The university's refusal to accommodate her disability, the hostile work environment, and continued exclusion from critical teaching duties led to chronic mental health deterioration. Ms. Chapman's condition was clinically assessed and documented by a psychiatrist on April 15, 2025, diagnosing her with moderately severe Major Depressive Disorder (F32.2), severe Generalized Anxiety

Disorder (F41.1), Post-Traumatic Stress Disorder (F43.10), and recurrent panic attacks (F41.0). Her PHQ-9 score of 14 and GAD-7 score of 20—the maximum possible—highlight the severity of her condition.

35. Ms. Chapman's PTSD diagnosis is primarily rooted in the racially hostile treatment she experienced at Averett University. However, as confirmed by her psychiatrist, this trauma reactivated and intensified psychological vulnerabilities tied to a prior racial assault that occurred around 2011 or 2012, in which she was followed into a gym parking lot, spat on, and called a racial slur. While she had never previously exhibited clinical PTSD symptoms, the discrimination, exclusion, and retaliation she faced at Averett triggered flashbacks and panic episodes that had not been present before. Her psychiatrist explained that these workplace interactions activated trauma-related responses, leading to severe anxiety, depression, and loss of functional capacity. This compounding effect underscores the significant emotional toll inflicted by Averett's conduct.

36. These mental health challenges were further compounded by physiological symptoms including insomnia lasting up to 48 hours, intrusive flashbacks, chest tightness, and panic-induced hyperventilation. Ms. Chapman was prescribed escitalopram (daily) and lorazepam (as needed), and referred for continued psychotherapy. Despite these interventions, the psychiatric report emphasized an "extremely difficult" level of functional impairment across work, social, and personal domains—aggravated each time Ms. Chapman had to interact with her supervisors or engage in legal proceedings.

37. Using peer-reviewed Quality-Adjusted Life Year (QALY) analysis, Dr. Gleb Tsipursky quantified the cumulative effect of these psychiatric conditions at a reduction of 0.84 QALY per year, translating to $138,600 in lost health value annually. From the time her symptoms began in June 2024 through April 2025, this amounted to $115,500 in lost well-being. Anticipating that her symptoms will persist until this case is resolved, her projected losses could reach between $184,800 and $254,100 by trial's end. Factoring in the expected duration of psychological recovery, total long-term losses could exceed $400,000.

38. These figures are not speculative: they are based on well-established public health methodologies used by U.S. government agencies to evaluate the cost of lost quality of life. The expert analysis confirms that the hostile work environment at Averett did not just cause emotional hardship—it caused quantifiable, life-altering damage that continues to affect Ms. Chapman's ability to function professionally and personally.

## H. Legal Claims

## COUNT I – Race Discrimination

**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a))**
**Plaintiff re-alleges and incorporates all preceding paragraphs.**

To establish a prima facie case of race discrimination under Title VII, a plaintiff must show that:

(1)She is a member of a protected class; (2) She was qualified for her position; (3)She suffered an adverse employment action; and (4)Similarly situated employees outside the protected class received more favorable treatment.

The Fourth Circuit emphasizes that comparators "need not be carbon copies," but only "similar in all relevant respects," such as sharing the same supervisor, performance standards, and type of conduct. Haynes v. Waste Connections, Inc., 922 F.3d 219,223 (4th Cir. 2019).

Plaintiff, Sharlene A. Chapman, is an African American nursing instructor with a master's degree and certifications in online teaching. Despite strong teaching evaluations, being qualified, and relevant experience, Averett University repeatedly:

- Denied her course assignments (e.g., NUR211 or NUR330) which constitutes the adverse employment action of lost employment opportunity, even while less qualified white colleagues [Kaleigh Wilson-NUR211] or colleagues who were already at the max credit load for full time in an academic term/year per university policy [Kimberly Lott-NUR330] were granted these courses;
  - o Title VII flatly bars practices that "would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." 42 U.S.C. § 2000e-2(a)(2).

- Issued a discriminatory performance evaluation, penalizing her for uncommunicated requirements (e.g., "course reports"), while comparators were not penalized for similar or worse conduct [Kaleigh Wilson & Sarah Salen];
- Provided contradictory explanations about assignment distribution, including Dr. Kathy Cline's admission: "I'll give the course to Plaintiff if I can't find someone else";
- Refused accommodation for a documented cardiac condition that could have been addressed by assigning her available online courses, instead giving those courses to white non-disabled colleagues;
- Excluded her from faculty responsibilities, such as test reviews and planning discussions, following her EEOC complaint.

Plaintiff names multiple comparators:

- Kaleigh Wilson, who lacked nursing didactic experience, online teaching certifications, or online teaching experience, yet was assigned NUR211 over Plaintiff;
- Sarah Salen, who taught three online courses (9 credits) in the Summer 2024 (max credits allowed to teach is 6 in the Summer).
- Dr. Kimberly Lott, who was granted priority in course assignments while Plaintiff was told to wait to receive what was left, despite being at the max credit load for the term/academic year.

Although comparators "need not be an exact match," these individuals shared Plaintiff's job title as contracted adjunct online course instructors, reported to the same supervisor (Kathy Cline,

DNP, RN Associate Dean, ABSN Program), and taught in the same ABSN online program with no additional responsibilities in the ABSN program, making them proper comparators under Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010).

Moreover, under *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), pretextual justifications can support an inference of discrimination. Defendant's explanations—such as performance equalization and informal preference—lack documentation and shift over time, undermining their credibility. Internal messages and evaluations suggest Plaintiff was penalized based on racial bias, with evidence of a "horns effect" in evaluations and discretionary favoritism for white instructors.

Taken together, these facts support a claim that Averett University engaged in race-based discrimination. Plaintiff respectfully seeks relief including compensatory damages, back pay, attorney's fees, expert witness fees, and all other remedies available under Title VII.

## COUNT II – Disability Discrimination

## (Americans with Disabilities Act, 42 U.S.C. § 12112(a))

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show:

(1)She has a disability as defined by the ADA; (2) She was qualified for her position and able to perform the essential functions of the job with or without reasonable accommodation; and (3)She suffered an adverse employment action because of her disability.
(*Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012))

- Plaintiff, Sharlene A. Chapman, has medically documented disabilities, including a cardiac condition (that during the relevant times caused her chest pain, palpitations, and shortness of breath) and clinically diagnosed Generalized Anxiety Disorder, PTSD, and panic disorder which was caused by the conduct of Averett University.
- These conditions substantially limit major life activities, including breathing, circulation, working, concentrating, and emotional regulation.
- Despite these impairments, Plaintiff was fully qualified for her adjunct teaching duties and capable of performing all essential functions with a reasonable accommodation.
- Plaintiff requested a specific, reasonable accommodation: increased online teaching assignments in place of physically demanding clinical roles that she taught in the hospital setting for Averett University students.
- This request was medically supported, consistent with her prior performance, and aligned with institutional policies allowing adjuncts to teach up to 9 or more credits with approval.
- Defendant, through Dr. Kathy Cline, summarily rejected the accommodation request without discussion or alternatives, stating "If you are having difficulty I don't believe you should take on more."

- Defendant failed to initiate the required interactive process with the Plaintiff and instead granted additional assignments to non-disabled, less qualified white colleagues and colleagues who would exceed the max credit limit. Citing reasons such as Dr Cline had promised Dr Lott a course and to get didactic Kaleigh Wilson experience. This constitutes an adverse employment action because after disclosing her disability the Plaintiff was denied job opportunities that she was qualified for and available for.
- Defendant also "regarded" Plaintiff as disabled by making assumptions about her capabilities post-disclosure of her medical conditions, including comments like "What does this mean for your online classes?" despite the courses being asynchronous and "I don't believe you should take on more".
- Defendant's actions constitute disparate treatment based on disability, failure to accommodate, and refusal to engage in a good-faith interactive process, in violation of 42 U.S.C. §§ 12112(a) and (b)(5)(A).

**COUNT III – Failure to Accommodate**

**(Americans with Disabilities Act, 42 U.S.C. § 12112(b)(5)(A))**

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

To establish a failure-to-accommodate claim under the ADA, a plaintiff must show:

(1) She has a disability under the ADA; (2) Her employer had knowledge of the disability; (3) A reasonable accommodation would enable her to perform essential job functions; and (4) The employer refused to make such an accommodation.
(*Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013))

- Plaintiff disclosed the associated symptoms of a cardiac condition—including chest pain, shortness of breath, and palpitations—as well as later-diagnosed Anxiety.
- Plaintiff's impairments were communicated to Defendant through an August 2024 email that included a work note referencing her anxiety, and a text message to Dr. Cline in June 2024 describing symptoms of chest pain, shortness of breath, and palpitations. While full medical records and prescriptions (e.g., Zoloft, Prozac, Lexapro, Ativan) were not submitted at the time, Defendant had sufficient notice of the underlying health concerns to trigger its obligation to initiate the interactive process and request such documents.
- Plaintiff requested a specific reasonable accommodation to reduce physical strain: reassignment from clinical teaching duties to additional online course instruction.
- This accommodation was reasonable, consistent with her prior assignments, and aligned with university policy allowing adjuncts to teach up to 9 credits or more.
- Defendant had discretion to assign courses and, in practice, permitted similarly situated white adjuncts to exceed standard credit loads or assume online courses without didactic or online teaching experience. These courses included those the Plaintiff had requested NUR211 or NUR330.
- Despite having available online courses and knowledge of Plaintiff's limitations, Defendant—through Associate Dean Kathy Cline—refused the accommodation outright.

- Dr. Cline made no effort to explore alternatives or initiate a good-faith interactive process, in violation of ADA requirements.
- Dr. Cline's June 2024 dismissive responses—such as "I don't believe you should take on more"—reflect a failure to engage in a good-faith interactive process, as required by law.
- Plaintiff's impairments were communicated to Defendant via an email addressed to Dean Teresa Beach, HR Director Kathie Tune, the University President Tiffany Franks, and the VP of Academics Virginia Henderson. The email disclosed Plaintiff's anxiety, shortness of breath, and chest pain, and attached a medical work restriction note from Sentara Telehealth Services recommending she avoid physically strenuous activities and minimize exposure to high-stress environments. While full psychiatric records and prescriptions were not submitted at the time, this communication gave Defendant sufficient notice of a potential disability to trigger its obligation to initiate the interactive process and, if necessary, request additional medical documentation.
- Defendant's inaction and refusal to accommodate Plaintiff's medically-linked limitations violated its obligations under 42 U.S.C. § 12112(b)(5)(A).

## COUNT IV – Retaliation

### (Title VII, 42 U.S.C. § 2000e-3(a); ADA, 42 U.S.C. § 12203(a))

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

To establish a prima facie case of retaliation, a plaintiff must show:

(1) She engaged in protected activity; (2)She suffered an adverse employment action; and (3) There was a causal connection between the protected activity and the adverse action. (*Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015))

- Plaintiff engaged in multiple forms of protected activity, including:
    - Submitting a written complaint to HR Director Kathie Tune on July 31, 2024, reporting racially discriminatory treatment in performance evaluations and course assignments, and raising concerns about racially insensitive remarks allegedly made by Dr. Kathy Cline;
    - Submitting a formal follow-up complaint on August 15, 2024, to HR, Dean Beach, the President, and the VP of Academics, alleging ongoing retaliation, requesting accommodation, and expressing concerns about the hostile impact of Dr. Cline's actions;
    - Disclosing disability-related symptoms and attaching a medical work restriction note from Sentara Telehealth recommending limited physical exertion and stress avoidance;
    - Requesting a reasonable accommodation in the form of additional online courses due to her cardiac condition and anxiety;
    - Filing an EEOC charge alleging race and disability discrimination.
- Following these protected activities, Plaintiff experienced a series of adverse actions, including:
    - Exclusion from test reviews;

- o Denial of requested course assignments in favor of less qualified, non-disabled white colleagues or colleagues exceeding the max credit load post disclosure of medical condition;
- o A negative performance evaluation that had been internally contested and lacked uniform application;
- o Hostile and dismissive communications from supervisors, particularly Dr. Cline and Dean Beach;
- These retaliatory acts followed closely after Plaintiff's complaints and disability disclosures and included Dr. Cline questioning Plaintiff's ability to continue teaching online courses—despite those being asynchronous and already operational—implying her teaching role was at risk due to her disclosed health status and need for a medical appointment.
- Defendant's failure to investigate or remediate the behavior described in Plaintiff's July 31 and August 15 complaints, and its subsequent pattern of exclusion and dismissiveness, supports a direct causal connection between Plaintiff's protected conduct and the retaliation she experienced.
- Defendant's actions violate the anti-retaliation provisions of both Title VII (42 U.S.C. § 2000e-3(a)) and the ADA (42 U.S.C. § 12203(a)).

## COUNT V – Hostile Work Environment

## (Title VII, 42 U.S.C. § 2000e-2(a); ADA, 42 U.S.C. § 12112(a))

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

To establish a hostile work environment claim under Title VII or the ADA, a plaintiff must show:

(1) She was subjected to unwelcome conduct; (2) The conduct was based on a protected characteristic (e.g., race or disability); (3) The conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive environment; and (4) The conduct was imputable to the employer.
(*EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009))

- Plaintiff, an African American woman with newly diagnosed cardiac and psychiatric disabilities, was subjected to repeated, unwelcome, and discriminatory conduct by supervisory staff at Averett University, most notably Dr. Kathy Cline.
- The conduct was based on Plaintiff's race and disability and included:
  - o Disparate performance evaluations compared to white colleagues without valid justification;
  - o Dismissal of her accommodation requests despite sharing her doctors note in August of 2024 and despite informing her supervisor of her symptoms in June 2024;
  - o Denial of online course assignments in favor of white, non-disabled faculty;
  - o Exclusion from test reviews which are pertinent to her role and student evaluations;
  - o Dismissive, hostile, and antagonistic responses from supervisors, including Kathy Cline and Teresea Beach.

- This pattern of hostility extended to other minority colleagues and students:
  - o **Veronica Zeigler**, a Latina employee returning from FMLA, was verbally attacked by Sandra Raker, shunned by Dr. Cline, and reportedly the subject of efforts to be terminated upon return from medical leave. Was told by Dr Cline to "give them a hard time" when speaking of faculty of color.
  - o **Calise Greenaway**, an African American Clinical Coordinator, was excluded from key communications by Dr Cline after objecting to unprofessional remarks by Dr. Cline. Witnessed efforts to oust another African American employee [Patrice Sainvil-Thompson] including using Calise and Veronica to reprimand Patrice. Heard Dr Cline make racially insensitive remarks regarding African students.
  - o **Dr. Chawndel Edmonds**, an African American woman and mother of a disabled child, was required to work on-site while her white counterpart, Dr. Amanda Carter, was permitted to work remotely from Florida. Both of whom are ABSN Didactic Couse Leads. Despite different work ethic, both were later assigned identical performance scores under the false justification of equality after Dr Edmonds reported to HR and Dean Beach about the unfair treatment. She was also given trivial work after her complaint.
  - o **Nathalie Willis**, an African American nursing student, was publicly berated by Sandra Raker and denied support by Dr. Cline, who threatened to discipline her after she sought truth about the incident. Dr Cline stated she did not see Raker point in her face or yell at her when it happened in her [Dr Cline's] presence in her office
  - o **Mathieu Tolno**, an African student, was treated differently from white peers in grading and appeal opportunities and described being intimidated by Dr. Cline after refusing to sign a failure notice.
  - o **Pheebe Abraham,** an African student who had to sit a semester out after having her baby because she had a 10lb weight restriction that would only last 3 more weeks. Her physician otherwise cleared her to return to school. The student communicated with the Title IX office [Amanda] and they suggested to Dr Cline and Dr Beach that the student be allowed to complete her didactic online coursework until she is cleared of her weight restrictions in 3 weeks and then allow her to make up the clinicals. Dr Beach and Dr Cline refused to allow the student to return stating that she would be too far behind when previously make up clinicals were allowed. However, a white pregnant student was told to get a note that said she didn't have restrictions so that she could complete clinicals and was given 2 clinicals per week so she would be finished with clinicals by the time she gave birth. Shortly after this decision was made Averett wrote in their March 5 2025 and March 12 2025 Coffee Break [Announcements] that "Students who are pregnant and/or are impacted by a pregnancy-related condition have a right to academic accommodations, environmental modifications and other support. No determinations regarding accommodations, withdrawals or participation can be made by faculty, program directors or any other employee without the involvement of the Title IX coordinator and/or Assistant Director or Academic Support"
- These incidents show that the hostile work environment was not isolated to Plaintiff but reflected a broader, institutionalized culture of racial and disability-based discrimination. This pervasive hostility amplified Plaintiff's own psychological harm and sense of vulnerability.

- Plaintiff (and others at the university) reasonably feared that asserting their rights would lead to punishment. The University's consistent failure to address or investigate formal complaints, including those submitted by the Plaintiff on July 31 and August 15, 2024, demonstrated an institutional tolerance of discrimination and retaliation.
- As corroborated by Dr. Gleb Tsipursky's expert evaluation, these experiences led to clinically diagnosed PTSD, Generalized Anxiety Disorder, and panic disorder, severely impairing Plaintiff's health and professional functioning. Her emotional distress was compounded each time she engaged with supervisors or the legal process.
- Because the discriminatory conduct was committed by supervisory personnel and Averett failed to intervene after repeated notice, the hostile work environment is imputable to the employer.
- Defendant's actions and omissions created a racially and medically hostile workplace in violation of Title VII and the ADA.

**Damages-Emotional Distress and Mental Anguish**
*(Compensatory Damages under Title VII and the ADA, 42 U.S.C. § 1981a(b)(2)–(3))*

Plaintiff re-alleges and incorporates all preceding paragraphs.

To recover compensatory damages for emotional distress in an employment-discrimination case, Plaintiff must show: (1) Defendant violated Title VII or the ADA; (2) Plaintiff suffered actual emotional distress or mental anguish as a result; and (3) That distress is supported by competent evidence (medical records, expert opinion, or detailed personal testimony).
*See* Fox v. Gen. Motors Corp., 247 F.3d 169, 179 (4th Cir. 2001);
Hetzel v. Cty. of Prince William, 89 F.3d 169, 171 (4th Cir. 1996).

Not a standalone tort claim—this is a component of damages tied to statutory violations.

Section 1981a(b)(2) expressly allows recovery for "emotional pain, suffering, inconvenience, mental anguish, [and] loss of enjoyment of life," and the Supreme Court has held that actionable harassment "need not lead to a diagnosable injury."
*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993); accord
*Bryant v. Aiken Reg'l Med. Ctrs.*, 333 F.3d 536, 547 (4th Cir. 2003) (upholding award without physical symptoms).

- Unlawful conduct: Defendant's race-based discrimination, failure to accommodate Plaintiff's disability, retaliatory acts, and hostile environment directly caused Plaintiff's psychological harm.
- Diagnosis: On April 15 2025, a licensed psychiatrist diagnosed Plaintiff with (1) Severe Generalized Anxiety Disorder (F41.1), (2) Post-Traumatic Stress Disorder (F43.10), and (3) Recurrent Panic Attacks (F41.0). PHQ-9 = 14; GAD-7 = 20.
- Symptoms: Insomnia, chest tightness, hyperventilation, crying spells, intrusive flashbacks, and marked impairment in social, occupational, and personal functioning.
- Expert valuation: Dr. Gleb Tsipursky's QALY analysis estimates a lost health value of $115,500 as of April 2025 and $369,600–$508,200 if symptoms persist.

- Fourth Circuit standard: Medical and expert evidence of this kind supports emotional-distress damages.
- Prayer for relief: Plaintiff seeks compensatory damages up to the statutory cap applicable under § 1981a(b)(3), together with any additional equitable relief this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sharlene A. Chapman respectfully requests that this Court enter judgment in her favor and against Defendant Averett University and award the following relief under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act (ADA):

A. Compensatory and Punitive Damages (Title VII and ADA):
An award of compensatory and punitive damages in a total amount not to exceed the statutory cap of $300,000 under 42 U.S.C. § 1981a(b)(3), based on Defendant's discriminatory, retaliatory, and unlawful conduct. Plaintiff respectfully requests that the Court or jury allocate this amount among the Title VII and ADA claims as appropriate. In the event that one or more claims are dismissed, Plaintiff requests that the full amount still be considered under any surviving claim.

B. Back Pay:
An award of $13,500 in back pay representing wages lost due to under-assignment of courses for three academic terms for which Plaintiff was qualified and available.

C. Attorneys' Fees and Court Costs:
An award of $16,137.50 in currently accrued attorneys' fees, plus any additional fees and litigation costs as may be allowed under 42 U.S.C. §§ 1988, 2000e-5(k), and 12205.

- Court filing fee: $405
- Estimated deposition-related costs: $3,500 to $7,000

D. Expert Witness Fees:

- Expert services to date: $15,000
- Additional fees anticipated for trial testimony and preparation

E. Injunctive and Equitable Relief:

- Mandatory ADA and Title VII compliance training for all Averett University faculty and administrative personnel
- Review and potential disciplinary action regarding the conduct of Dr. Kathy Cline including demotion or termination
- Policy revisions to ensure fair course assignment and consistent accommodation practices

F. Declaratory Relief:
A declaration that Defendant's conduct violated Plaintiff's rights under Title VII and the ADA.

G. Pre- and Post-Judgment Interest on all awarded sums.

H. Any further relief the Court deems just and proper.

Respectfully submitted,

*Sharlene Chapman*

Sharlene A. Chapman
Pro Se Plaintiff
34 Scotland Rd Hampton, VA 23663
(540) 819-0729
sharleneachapman@yahoo.com

May 14, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of May 2025, a true and correct copy of the foregoing Amended Complaint, along with all supporting documents, was served via email to the following:

**Stephanie P. Karn, Esq.**
Williams Mullen
200 South 10th Street, Suite 1600
Richmond, Virginia 23219
Email: skarn@williamsmullen.com
Counsel for Defendant Averett University

**Preston Wagner Ball**
Williams Mullen
222 Central Park Avenue
Suite 1700
Virginia Beach, VA 23462
757-473-5330
Email: pball@williamsmullen.com

Counsel for Defendant Averett University

Sharlene A. Chapman
Pro Se Plaintiff
34 Scotland Rd
Hampton, VA 23663
(540) 819-0729
sharleneachapman@yahoo.com

**GHOSTWRITING CERTIFICATION**

Pursuant to Local Civil Rule 83.1(M) of the United States District Court for the Eastern District of Virginia, I certify that no attorney has drafted, authored, or substantively assisted in the preparation of this filing. The content of this document was prepared solely by me, the undersigned pro se litigant.

Respectfully submitted,

Sharlene A. Chapman
Pro Se Plaintiff